ORDER OF REMAND
GARY P. SULLIVAN, Chief Justice.
A Petition for Review and Motion for Stay and Emergency Ruling having been filed on June 8, 2001, by Melissa G. Buckles, Tribal Lay Advocate, on behalf of Rose Morsette, from an order filed on June 7, 2001, re-affirming an order dated November 17, 2001, which awarded custody of the subject minor to Fred and Myr-tie Olson of Portland, OR. The order is vacated and the matter is remanded to the Tribal Court with instructions to conduct a new hearing in accordance with the order that follows.
Upon reviewing the petition, Motion for Stay and Emergency Ruling, the attached affidavits and the various reports of Constance F. Andvik, M.S.W., Nellie Youpee, M.A. and Joseph Walczak, Psy.D., and after conducting a telephone conference on June 13, 2001 with Melissa Buckles, Tribal Lay Advocate on behalf of Rose Morsette, Robert E. Welch, Tribal Lay Advocate on behalf of Fred and Myrtle Olson, and Joseph M. Raffiani, Esq., on behalf of the Department of Public Health and Human Services, Child and Family Services (herein “CFS”), the Court bases its order on the following [1]:
1. M.O. is one of five siblings. On October 28, 1998, M.O., her younger brother F.O. and their parents were involved in an automobile accident. M.O.’s mother was killed; her father was rendered a quadriplegic. Neither M.O. nor F.O. was seriously injured. Subsequent to the accident M.O. has resided with several relatives as well as a family friend for varying lengths of time. She has lived with her father, Brian Olson in Hardin, MT., paternal grandparents, Fred and Myrtle Olson in Portland, OR, maternal grandmother, Margaret Big Leggins in Poplar, MT., Rose and John Morsette (Rose is M.O.’s maternal aunt), and Dinette O’Connor, a family friend, in Poplar, MT. According to Nellie Youpee’s report, three of M.O.’s siblings live on the Fort Peck Indian Reservation. M.O.’s younger brother F.O. lives with the Olsons in Portland, OR.
*332 2. On November 17, 2000, the Tribal Court, the Honorable Juanita Azure presiding, issued an “Amended Order” which referenced a “Fact Finding Hearing” which “came before the Tribal Court on the 12th day of April, 1999”[2], the Honorable John Christian presiding. The hearing was pursuant to Title IX CCOJ 2000 § 301 (formerly Title V CCOJ § 301). This “Amended Order” stated: “... 2. The above-named minor children (M.O. and F.O.) shall continue as Wards of this Court.” The order goes on to state that the “care and supervision of (M.O. and F.O.) by CFS is hereby terminated ... ”. The order then awards “permanent care, custody and supervision of (M.O. and F.O.) ... to Myrtle Olson.”
3. Eleven days later on November 28, 2000, the Tribal Court, the Honorable Juanita Azure presiding, issued a “Temporary Custody Order” which stated: .. And it appearing to the Court that for the best interests of the above-named child, care, support, and supervision is required and the Court should take immediate action; IT IS HEREBY ORDERED that Temporary Custody of (M.O.), be given to the Department of Public Health and Human Services, Child and Family Services (a.k.a.‘CFS’), with full responsibility for her care and protection and authority to act on her behalf.” (Emphasis added) During the telephone conference on June 13, 2001, referenced above, Counsel for “CFS”, Joseph Raffiani, stated that immediately after the November 28th order, the CFS gave physical custody of M.O. to John and Rose Morsette. Mr. Raffiani further stated that, it was his understanding that the reason that Judge Azure asked him to draft the November 28th order was due to the Court’s concern about the prior order of November 17th. The precise concerns of the Court were not disclosed. The order also referenced a petition that was to be filed “on or about the 4th day of December, 2000”. It is believed that this reference was to a petition for custody filed by M.O.’s maternal grandmother, Margaret Big Leggins.
4. Subsequent to the temporary custodial order of November 28, 2000, three separate petitions were filed: One on behalf of Myrtle Olson, the paternal grandmother; One on behalf of Rose Morsette, the maternal aunt; and the one referenced in paragraph three above, filed on behalf of Margaret Big Leggins.
5. The matter of the three petitions came on before the Honorable Barry Bighorn on May 25, 2001. Neither Rose Mor-sette nor Margaret Big Leggins appeared at the hearing. Robert E. Welch, Tribal Lay Advocate, appeared on behalf of Myrtle Olson. The CFS, having been granted the temporary custody of M.O. pursuant to the November 28th order, was not given notice of the May 25, 2001 hearing. In its order, the Court stated that it had “received a letter written by (Margaret) dated May 10, 2001 and officially received by the Court on May 21, 2001, in part requesting the Court to grant her withdrawal of her custody petition”. Accordingly, the Court ordered that the petition of Margaret Big Leggins be dismissed and that the Court reaffirmed its previous order issued on November 17th “granting permanent care, custody, and supervision of M.O .... to the paternal grandmother Myrtle Olson”, stating that the order of November 17th was “... a valid and standing order of this Court.” The Court failed to mention the *333 order of November 28th granting temporary custody of M.O. to the CFS.
6. During the telephonic conference of June 13, 2001 referenced above, it was disclosed that Rose Morsette withdrew her petition on April 21, 2001, in favor of Margaret Big Leggins’ petition; and that Margaret wrote her letter to the Judge after being told that she would not likely prevail at the hearing. Rose, after learning of Margaret’s withdrawal and the Court’s order granting permanent custody of M.O. to Myrtle Olson, tiled a Petition for Review and a Motion for Stay and Emergency Ruling.
7. On or about May 25, 2001, M.O.’s elementary school counselor[3] referred M.O. to Constance F. Andvik, M.S.W., a licensed clinical social worker for the Indian Health Services. Ms. Andvik met with M.O. on three separate occasions between May 25th and June 4th. On May 81, 2001, Nellie Youpee, M.A., a Crisis Counselor with the Sexual Abuse Victim’s Treatment Program[4] interviewed M.O. Ms. Youpee referred M.O. to Joseph Walzcak, Psy.D., a licensed psychologist and director of the Mental Health Department. In his report, Dr. Walzcak recounts his interview and clinical impressions of M.O. in his session with her on June 6, 2001. He also reviewed his history with M.O. dating from October 30, 1998 and stated that M.O.’s family members had requested an appointment for her in April, 1999, however, she did not keep her appointment with him. All three of the reporting social services/health care providers stated that, in their opinion, M.O. was suffering from depression and anxiety, the cause of which was her unresolved grief resulting from the automobile accident, and which was exacerbated by the order of the Tribal Court sending her to live with the Olsons in Portland, OR M.O. was cited as saying, “I’m going to run away if they (the Olsons) take me to Portland”; “My grandfather (Fred Olson) beats me with a belt”; she also stated that although the Olsons live in a nice house with a nice yard, she “wTants to live with family and friends which are here in Poplar”. M.O. also stated that she does not like staying with Rose because “she’s mean and yells a lot”. Ms. Youpee concluded in her report:
“It is apparent that Madonna is experiencing depression which is more than likely related to unresolved grief regarding her mother’s death and the disruption of her family since that time. She needs a stable environment, a supportive caretaker, and consistent mental health services. All of these things should have been provided to her immediately after her mother’s death by the adults or agencies that have been responsible for her. The tribe has a responsibility to look out for the best interest of her and there is no guarantee that issues will be addressed if she went out to Portland, where she doesn’t want to go in the first place ...”
In her affidavit filed with the Motion for Stay, Ms. Andvik states:
“Based on the information and assessments of M.O. I am requesting that a petition be filed that supports the child’s best interest of staying on the Fort Peck Reservation and a plan of counseling *334 services be developed that supports her mental health needs ...”
In his report, Dr. Walczak indicates:
“(M.O.) is a 10-year-old Native American female whose life has been severely disrupted subsequent to the loss of her mother and physical impairment of her father ... (She) demonstrates several symptoms of depression including a poor sleep history, periods of low energy, feelings of low self-esteem, feelings of despair and hopelessness and periods of sadness and tears. Collateral information suggests she is clinically depressed. A Reynolds Child Depression Scale administered by Nellie Youpee, Ml., ... indicates a score at the 90th percentile, which is clinically significant.
Diagnostically, (M.O.) is experiencing symptoms of depression and post-traumatic stress disorder. At the very least, (she) has moved from grief reaction into mild dysthymia. At worst, into depression and post-traumatic stress disorder. (M.O.) needs to be consistently followed by a mental health provider to tease out the diagnostic picture and to ascertain a consistent treatment program regardless of with whom she is residing and regardless of where she is living ... ... The question of which relative placement for her is appropriate needs to be addressed immediately ...”
Dr. Walczak goes on to report that (M.O.) “articulated to me that she would choose to live either with her maternal grandmother, Margaret Bigleggins (sp) or Dinette O’Connor, a family friend”. He further states that (M.O.) told him that she had written “a letter to the judge” and that he believes that she expressed a willingness to “talk to the judge.”
8. The Tribal Court erred in its June 7th order by failing to acknowledge the order of November 28th. giving temporary custody to the CFS. It also erred in failing to give notice to the CFS of the May 25th healing. Further, the Tribal Court failed to cite its findings of fact, which formed the basis for placement of M.O. with the Olsons. We acknowledge the fact that the Olsons’ petition was before the court uncontested, yet there is still a responsibility for the court to set forth in detail its reasoning for the placement (See Owens v. Matthews, FPCOA # 336, 2000 WL 35716694, 2 Am. Tribal Law 215 (2000)). The only rationale stated in the June 7th order was, “... The Court determined, that it had previously granted custody to the respondent paternal grandmother Myrtle Olson on the 17th day of November, 2000 ...” All of our children are more deserving than to be placed as a result of a “default” hearing. Our Tribal Court must be vigilant in pursuing the “best interests” of our children and it must be diligent in requiring that all child custodial petitioners offer sufficient evidence of an environment that will serve the child’s best interests. It may be that the Olsons’ home in Portland provides the quintessential placement for M.O. It may also be that the Tribal Court had substantial evidence before it to conclude that the Olsons’ home would truly serve the “best interests of the children.” Unfortunately, we can only speculate about these most important issues because the Court’s order is silent regarding them.
9. While our Tribal Court’s June 7th order is wanting, we also note the important failure of those adults/agencies who were either legally or morally responsible for M.O.’s well being: 1) Rose Morsette for withdrawing her petition prematurely and relying on another relative’s petition; 2) Margaret Big Leggins for withdrawing her petition based on hearsay that she could not prevail; and most of all 3) the CFS for totally abandoning M.O. before her case was fully and completely heard. *335 These failures are even more striking given the tragic circumstances facing M.O. and her family. We can only hope that a second opportunity for M.O.’s placement will be well attended by those who love and care for her and those who are legally responsible for her well-being. According,
IT IS NOW THEREFOR THE ORDER OF THIS COURT:
The order of June 7, 2001, is vacated with instructions to the Tribal Court to hold a full and complete hearing in accordance with this order no later than August 30, 2001. All custodial petitions must be filed no later than July 30, 2001. The Tribal Court should strongly consider holding a preliminary hearing no later than August 10, 2001, to determine whether any home studies or related social services reports will be required, and if so, to set forth a deadline for such reports that will accommodate the August 30th hearing date.
CONCUR: GERARD M. SCHUSTER, Associate Justice, CARROLL J. DECOTEAU, Associate Justice.

. Due to the exigency of this matter, the entire file was not available for this Court's review. Subsequent to the filing of the petition and Motion for Stay, the order of November 17, 2000 was faxed to the Court of Appeals. The additional information not appearing in the filed documents was conveyed to this Court by the parties’ representatives during the telephone conference call.

. It cannot be determined whether this date is correct or whether it is a typographical error. If correct, there was an 18-month time lapse from the hearing until the amended order. If it is a typographical error and should actually read "2000”, then there was a 7-month time lapse.

. The school counselor’s name is written in cursive in Ms. Andvik’s report as "Lori K-” (last name illegible). The report states that the reason for the referral is due to "concerns child is expressing to her.”

. It should be noted that none of the reports, including Ms. Youpee’s, indicate any kind of actual sexual abuse. The reason for the referral to Ms. Youpee’s agency is not known, however, it most likely resulted from Ms. And-vik's concern that M.O.’s depression may be related to some form of abuse.